***********
The Full Commission has reviewed the entire record consisting of the briefs and oral arguments before the Full Commission on March 19, 2009, as well as the prior evidentiary record and the Full Commission Opinion and Award of June 22, 2007. Based upon all of the evidence of record, and in accordance with the directives of the Court of Appeals, the Full Commission enters the following Opinion and Award. *Page 2 
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over this matter.
2. All parties are subject to and bound by the North Carolina Workers Compensation Act.
3. All parties have been properly designated, and there is no question as to misjoinder or non-joinder of parties.
4. At all times relevant hereto, the employment relationship existed between employee Ronald Reaves (hereafter "decedent") and employer.
5. American Interstate Insurance is the proper insurance carrier for this claim.
6. Decedent's average weekly wage was $883.75, which would result in a compensation rate of $589.16.
7. Stipulated Exhibits 1 — 9 were entered into the record.
8. The issues before the Commission are whether the decedent's death arose out of and in the course of his employment with defendant-employer and, if so, to what benefits is his surviving spouse entitled. On remand, pursuant to the directives of the Court of Appeals, the additional issues before the Commission are whether the Pickrell
presumption applies; whether decedent's death was caused by extreme work conditions; and whether inadequate safety measures of defendant-employer were a significant contributing factor in decedent's death. *Page 3 
 ***********
In accordance with the directives of the North Carolina Court of Appeals and based upon the foregoing stipulations and competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of his death, Ronald Reaves (hereinafter "decedent") was a 54-year-old man working for defendant-employer as a welder.
2. At the time of his death, decedent was survived by his wife Jacqueline B. Reaves (hereinafter "plaintiff") to whom he was married in 1999. Plaintiff is totally disabled and unable to support herself. She has been eligible for and has received Social Security disability benefits since 1993. Decedent was not survived by any other person that was either wholly or partially dependent upon him for their support.
3. At no time prior to April 1, 2004 had decedent complained of heart problems or tightness in his chest. On January 16, 2004, decedent underwent a physical examination at North Brunswick Family Medicine in Leland, North Carolina, where his blood pressure was noted as being 120/80, his resting heart rate at 76 beats per minute, with no history of cardiovascular disease.
4. On May 31, 2004 decedent and Robert Templeman traveled from Leland, North Carolina to Franklin, Virginia where they worked as a two-man team to repair a pump at the International Paper (IP) plant. Mr. Templeman was a machinist for defendant-employer and had been so employed since January 2001. Mr. Templeman had known decedent since being hired by defendant-employer. Mr. Templeman and decedent were friends. *Page 4 
5. Once in Franklin, the two men obtained separate hotel rooms and got a night's rest before the next day's work.
6. Although having a two-man crew was not a normal operating procedure for defendant-employer, only two men were required for the job at the IP plant in Franklin because the IP mill workers performed the pump teardown work, which would normally have been performed by the other two men on a four-man team. Thus, a two-man team was adequate for this job.
7. The job at IP was to be a one-day job, and the two men expected to work their standard 12-hour shift. According to Mr. Templeman, both he and decedent were used to these work hours and types of work. Mr. Templeman was the only person with decedent throughout most of the day on April 1, 2004. Mr. Templeman's testimony was taken both at a pre-hearing deposition and at the Deputy Commissioner's hearing.
8. On the morning of April 1, 2004, decedent and Mr. Templeman arrived at the IP mill around 7:00 a.m. However, the mill employees had not torn down the pump, so decedent and Mr. Templeman did not begin work until about 10:00 that morning. Between 7:00 a.m. and 10:00 a.m., Mr. Templeman and decedent went through plant orientation and staged the equipment they were going to use in the repair of the pump, which included mounting the machine they used to do the machining work.
9. Mr. Templeman and decedent worked in a pump room in the basement of the IP plant, which had little or no open air or ventilation. The pump room had 15-18 foot ceilings and was 30 feet wide by 40 feet deep. The temperature in the pump room was in the mid-80's. The inside of the mill was hotter (approximately 80 degrees) and more humid than outside the mill. *Page 5 
10. There was an entrance to the room 30-35 feet away from the pump where decedent and Mr. Templeman worked and that entrance consisted of a 10 x 12 foot opening into a hallway. The access hallway was 5 to 10 degrees cooler than the pump room. The only air flow in the pump room was an upright fan that was placed 20-25 feet from where decedent and Mr. Templeman were working.
11. Once the pump disassembly was completed by the IP employees, decedent and Mr. Templeman lifted the lathe up to the pump shaft and set it. Both men then set up their tools around the pump, put up lights and located power.
12. Decedent worked in the pump room for a total of eight or nine hours. While decedent was welding, he wore leather gloves and a face shield.
13. Decedent and Mr. Templeman worked in the area together, and decedent remained in the pump room while Mr. Templeman did his work, because it was against company policy for them to work alone on machinery. Both men took occasional breaks during the work day.
14. Decedent took breaks during the morning, but Mr. Templeman was uncertain how much of the time between 10:30 a.m. and 1:00 p.m. decedent was out of the room, because Mr. Templeman's back was to decedent while he worked.
15. Decedent's principal job, other than to serve as back up to Mr. Templeman, was to "tack weld" a metal sleeve to the front face of the pump. Decedent used a welding torch to heat the sleeve to approximately 300 degrees to insure that there would be no movement in the sleeve. Decedent spent a total of approximately 45 minutes heating up the sleeve and tack welding, approximately three hours of other physical work, and a total of eight to nine hours in the hot, humid and poorly ventilated basement room. *Page 6 
16. At approximately 7:00 p.m., decedent told Mr. Templeman that "he wasn't feeling good" and was going outside in a hallway to sit down. In all the years that Mr. Templeman worked with decedent, there had never been any other occasion when decedent had walked out of a job site complaining of not feeling well and being hot.
17. At approximately 10:30 p.m., decedent again complained that he was "hot and fatigued" and the heat was "getting to him." Mr. Templeman suggested that he go outside and take a break.
18. Mr. Templeman walked with decedent to their work truck, located outside at the entrance to the mill, and decedent got into the truck while Mr. Templeman went back into the mill to finish his clean up. There were no witnesses as to what occurred during the 45 minutes decedent was alone in the truck.
20. When Mr. Templeman went back to the truck, he found decedent lying in a reclined position. He tapped on the window, and when there was no response from decedent, Mr. Templeman went to the plant's EMT station to seek help. The medical staff found decedent dead in the truck.
21. An autopsy was performed on April 2, 2004, in which the medical examiner noted that: "The decedent was a 54 year old white man with no known significant past medical history apart from recent ear ache. While he was at work he complained of feeling hot. He was later found collapsed inside of a vehicle. At autopsy the decedent had evidence of severe atherosclerotic cardiovascular disease. . . .Cause of death: Coronary artery disease." The report noted that there were no injuries to account for decedent's death.
22. Debra S. Meurs testified as an expert in industrial safety. She is the Environmental Compliance Specialist for the City of Greensboro and the owner of a safety and *Page 7 
environmental company, with over 30 years of experience in industrial safety. Ms. Meurs reviewed the circumstances surrounding the death of decedent. In preparation for her testimony, Ms. Meurs reviewed defendant-employer's Safety Manual, all of the documentation provided in discovery by defendants pertaining to decedent and Mr. Templeman's safety training, the various accident investigation reports, the Industrial Commission documents, and decedent and Mr. Templeman's employment files provided by defendants during discovery, all of which are a part of the record in this matter in the form of stipulated exhibits.
23. Ms. Meurs was of the opinion that on April 1, 2004, decedent was subjected to a work hazard, namely, a hot and humid work space, with poor ventilation. According to Ms. Meurs, OSHA regulations required defendant-employer to properly train decedent and Mr. Templeman in the recognition and response to the presence of work hazards, and no documentation exists that either decedent or Mr. Templeman had received such training. Mr. Templeman testified that he had not received any type of training as to what to do when a co-worker complained of feeling hot and fatigued to the point that he had to leave a job. There is no evidence in the record that defendant-employer was cited by OSHA for safety violations as the result of this incident.
24. Ms. Meurs believed that Mr. Templeman's response to decedent's complaint was inadequate, and that decedent should have been taken to a medical facility. Mr. Templeman's response, according to Ms. Meurs, is attributable to his lack of training, and his actions on April 1, 2004, contributed to decedent's death.
25. Dr. William Holt, a board certified cardiologist in Wilmington, reviewed the autopsy report, office records from Wilmington Health Associates, and various documents *Page 8 
concerning the death of decedent. Dr. Holt characterized decedent's health prior to April 1, 2004 as "good" with no record of any impairment whatsoever.
26. According to Dr. Holt, poor ventilation and heat increase the stress on the cardiovascular system, which can lower the blood pressure and create additional stressors on the heart.
27. The autopsy finding of "no thrombosis" was significant to Dr. Holt, as it meant that decedent did not have a "myocardial infarction, which is a heart attack in layman's terms." Dr. Holt was of the opinion that decedent had a rhythm problem in his heart due to a lack of blood supply to the heart muscle, which was aggravated by the heat and other work conditions to which decedent was exposed on April 1, 2004.
28. Dr. Holt believed that had decedent been taken to an EMT or other medical professional when he complained of feeling ill, decedent would have been properly examined and assessed and appropriate treatment provided, including using a defibrillator if decedent had suffered an arrhythmia.
29. Dr. Holt stated that the work conditions to which decedent was exposed on April 1, 2004, were significant contributing factors in decedent's death. Although the autopsy and death certificate did not state that decedent had suffered a heat stroke or heat exhaustion, Dr. Holt assumed that decedent was overheated, dehydrated and had low blood pressure.
30. Dr. Arthur Davis, who is board certified in clinical and anatomic pathology and who specializes in the pathology of heart attacks, testified as an expert witness in this case. It was Dr. Holt's opinion that decedent's work conditions were not a significant contributing factor to decedent's death. *Page 9 
31. Dr. Davis testified that decedent died from a dysrhythmia followed by an arrhythmia, or heart attack. He acknowledged that heat can be a precipitating cause of a cardiac event, including a dysrhythmia. Dr. Davis also acknowledged that the pre-existing coronary artery disease would not, by itself, have caused decedent's death, but that there had to be a "malignant dysrhythmia."
32. Dr. Davis further testified that the symptoms of an acute heart attack are non-specific and that there would have been no way, without diagnostic testing, for a doctor or layperson to tell what was wrong with decedent or if his complaints were significant.
33. The Full Commission gives greater weight to the expert opinions of Dr. Holt and Ms. Meurs than to the causation opinion of Dr. Davis and holds that the greater weight of the evidence establishes that decedent's extreme work conditions were a contributing factor to his death. Although the evidence does not establish that decedent suffered from heat exhaustion or heat stroke, the greater weight of the evidence does show that decedent was exposed to heat, a special hazard, in the course of his employment and that the special hazard was a contributing factor to his death.
34. The Full Commission finds that there is insufficient evidence of record from which to prove by the greater weight that decedent's death was caused by the willful failure of defendant-employer to comply with any statutory requirements.
35. The evidence that Mr. Templeman's lack of training by defendant-employer was a significant contributing factor in decedent's death is speculative and given no weight by the Commission, particularly in light of the fact that decedent was left by himself in the truck for 45 minutes during which there is no evidence what occurred.
 *********** *Page 10 
In accordance with the directives of the Court of Appeals and based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order for plaintiff to recover workers' compensation benefits for the death of decedent, she must prove that his death resulted from an injury by accident arising out of decedent's employment and in the course of the employment. N.C. Gen. Stat. § 97-2(6). Plaintiff has the burden of proving each of these elements. Henry v. Leather Co., 231 N.C. 477, 479,57 S.E.2d 760, 761 (1950).
2. Where circumstances concerning work-relatedness are unknown and where the death occurs within the course of employment, there is a "presumption that death was work-related, and therefore compensable, whether the medical reason for death is known or unknown." Pickrell v.Motor Convoy, Inc., 322 N.C. 363, 370, 368 S.E.2d 582, 586 (1988). Where plaintiff is entitled to the presumption, defendant then has the burden of producing credible evidence that the death was not accidental or did not arise out of the employment. Bason v. Kraft Food Serv., Inc.,140 N.C. App. 124, 128, 535 S.E.2d 606, 609 (2000); Melton v. City ofRocky Mount, 118 N.C. App. 249, 256, 454 S.E.2d 704, 709 (to rebut the presumption, defendant must produce "sufficient, credible evidence that the death is non-compensable"), disc . review denied, 340 N.C. 568,460 S.E.2d 319 (1995). If defendant meets this burden of production, the presumption is successfully rebutted. The Industrial Commission must find the facts based on all the evidence presented, drawing such reasonable inferences from the competent, credible evidence as may be permissible. The burden of persuasion remains with plaintiff. Pickrell v. MotorConvoy, Inc., supra; Bason v. Kraft Food Serv., Inc., supra. *Page 11 
3. In the instant case, the greater weight of the evidence indicates that the circumstances regarding the work-relatedness of decedent's death are unknown and that the death occurred as the result of an injury by accident sustained in the course of decedent's employment. It is uncontested that plaintiff was within the course of his employment and was engaged in his employer's business at the time of his death. The fact that the immediate medical cause of decedent's death is known does not indicate that the Pickrell presumption does not apply. Pickrell v.Motor Convoy, Inc., supra.
4. Therefore, plaintiff is entitled to the Pickrell presumption that decedent's cause of death was an injury by accident arising out of the employment. Pickrell v. Motor Convoy, Inc., supra. As a result of the accident, decedent suffered dysrhythmia and died. There was an unknown precipitating cause for the dysrhythmia that resulted in decedent's death. Decedent's pre-existing coronary artery disease did not by itself cause decedent's death. Therefore, defendants have not successfully rebutted the presumption by coming forward with sufficient, credible evidence that death occurred as a result of a non-compensable cause.Pickrell v. Motor Convoy, Inc., supra; Melton v. City of Rocky Mount,supra.
5. Assuming arguendo that the Pickrell presumption does not apply, at issue is whether decedent's death arose out of the employment. N.C. Gen. Stat. § 97-2(6). In general an injury does not arise by accident if it happens when an employee is performing his normal duties in the usual way. Lawrence v. Mill, 265 N.C. 329, 144 S.E.2d 3 (1965). The courts have also held that in order to be compensable, injuries caused by a heart attack must be precipitated by unusual or extraordinary exertion or by occupational exposure to extreme conditions. Dillingham v. YearginConstruction Co., 320 N.C. 499, 358 S.E.2d 380 (1987); Fields v.Plumbing Co., 224 N.C. 841, 32 S.E.2d 623 (1945). The Supreme Court inFields stated: *Page 12 
 [W]here the employment subjects a workman to a special or particular hazard from the elements, such as excessive heat or cold, likely to produce sunstroke or freezing, death or disability resulting from such cause usually comes within the purview of the compensation acts. . . . The test is whether the employment subjects the workman to a greater hazard or risk than that to which he otherwise would be exposed.
 Id. at 842-43, 32 S.E.2d at 624.
6. In this case, the work which decedent was performing for defendant-employer subjected him to extreme conditions of heat and humidity which were greater than those conditions encountered by the general public. Dillingham v. Yeargin Construction Co., supra; Madisonv. Int'l Paper Co., 165 N.C. App. 144, 598 S.E.2d 196 (2004). Therefore, decedent sustained an injury by accident arising out of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6). Plaintiff's claim is therefore compensable under the provisions of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-1 et seq.
7. The death of decedent was not caused by the willful failure of defendant-employer to comply with any statutory requirement. N.C. Gen. Stat. § 97-12(3).
8. The lack of training in the recognition of health emergencies did not significantly contribute to the death of decedent. The evidence presented on this issue was speculative and conjecture. Young v. HickoryBusiness Furniture, 353 N.C. 227, 538 S.E.2d 912 (2000).
9. Decedent's average weekly wage at the time of his death was $883.75, which yields a compensation rate of $589.16 per week.
10. Jacqueline B. Reaves was wholly dependent upon decedent at the time of his death and is therefore entitled to death benefits. N.C. Gen. Stat. §§ 97-38, 97-39. Decedent did not leave any other persons who were either wholly or partially dependent upon decedent for *Page 13 
support. Therefore, Jacqueline B. Reaves is the only person entitled to take the death benefits in this matter.
11. Jacqueline B. Reaves is entitled to receive death benefits at the rate of $589.16 per week for 400 weeks beginning April 1, 2004. N.C. Gen. Stat. § 97-38. After said 400-week period, because Jacqueline B. Reaves was unable to support herself due to physical or mental disability as of April 1, 2004, she is entitled to continue to receive death benefits during her lifetime or until remarriage. N.C. Gen. Stat. § 97-38.
12. Plaintiff is entitled to payment of the medical expenses, if any, incurred for the treatment of decedent on April 1, 2004. N.C. Gen. Stat. § 97-25.
13. Defendants shall pay funeral expenses not to exceed $3,500.00 to the appropriate party who provided or previously paid for such services. N.C. Gen. Stat. § 97-40.
 ***********
In accordance with the directives of the Court of Appeals and based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Subject to attorney's fees approved below, defendants shall pay to Jacqueline B. Reaves death benefits at the rate of $589.16 per week for 400 weeks beginning April 1, 2004. Upon expiration of the 400-week period, defendants shall continue to pay death benefits to Jacqueline B. Reaves during her lifetime or until remarriage. Those amounts that have accrued shall be paid in a lump sum.
2. Defendants shall pay burial expenses not exceeding $3,500.00 to the person or persons entitled thereto. *Page 14 
3. Defendants shall pay medical expenses, if any, incurred as the result of decedent's death.
4. A reasonable attorney's fee of 25% of the death benefits awarded in Paragraph 1 above is approved for plaintiff's counsel and shall be paid as follows. Defendants shall pay 25% of the accrued benefits directly to plaintiff's counsel. Thereafter, every fourth check shall be paid to plaintiff's counsel.
5. Defendants shall pay the costs due the Commission.
This the 12th day of June 2009.
S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ STACI T. MEYER COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1